Thank you. May it please the Court, Michael von Lohenfeldt on behalf of the City of San Rafael. Also with me is Gordon Atkinson for the Homeowners Association. I'll be presenting the opponent's arguments today. I'd like to ask the Court's permission for five minutes for rebuttal. Manage your own time, though. Your Honor, the issues presented in this case are far from novel. Twenty years ago, this Court was already saying in Laval, we are called upon to consider yet again a takings challenge to mobile home rent control laws. That challenge is no more valid today than it was twenty years ago. The District Court here found that San Rafael's mobile home rent and vacancy control was both a Penn Central taking and a private taking in violation of the Public Use Clause. Those decisions are contrary to all established precedents, including most especially the en banc decision in the recent Guggenheim case, which, of course, the District Court did not have before it when it reached its ruling. The Guggenheim case reviewed the same type of challenge to essentially the same law, based on the same economic theories, presented by the same expert, on behalf of a landowner who, just like MHC, purchased a rent-controlled park and then claimed that somehow there was a taking because it wasn't allowed to charge uncontrolled rents. I'd like to focus my arguments on these primary legal errors at the heart of the case, although there are a lot of issues and I'm happy to answer questions on any aspect of the case that you have. There were two primary doctrinal errors in the Court's Penn Central analysis. First, the District Court found that MHC had a distinct investment-backed expectation of collecting market rents, that is, unregulated rents, even though it purchased the property already subject to rent and vacancy control. That's simply error under Guggenheim and a lot of other law that we'll be discussing. And second, the Court did not analyze the economic impact of the change in law that occurred in 1999 after MHC bought the park. Instead, what it did is it compared the amount of rent that MHC is able to collect today to the amount of rent MHC would be able to collect in the hypothetical world where there was no rent control at all. That is not the type of economic impact analysis required by Penn Central. And was there on the record any data as to the point you're raising, in other words, the post-99? There is, Your Honor. There are two pieces of data on that. We introduced, the city introduced data showing the actual delta through trial of the 100 percent CPI versus 75 percent CPI. That was just under $800,000 out of, I think, $26 million in rent or something. That, the evidence for that, Your Honor, is at page 4292 of the excerpts of record, and we discussed that in our brief. The district court agreed with MHC's expert, which instead of looking at the actual difference in rent, hypothesized that CPI would always be X amount and then compared the difference in perpetuity to an automatic 100 versus 75 percent CPI. That expert's analysis was that of the $120 million unregulated value, $10 million was lost as a result of this adjustment in perpetuity. So that's about 8 percent of the total theoretical unregulated value of the park. That same expert found that the park is currently worth $40 million under its analysis. Now, the, that's at page 3290 of the record, lines 5 through 14. The district court did not make a finding as to that piece of Dr. Quigley's analysis. Instead, the district court looked at other evidence as to the park's value. But whether you look at $20 million value and you assume that it would be 30 without the rent control or you look at a $40 million and you assume it would be 50 without rent control or you look at the actual facts, which are that of $26-some million in rent, $800,000 was lost, that's nowhere near the kind of impact that would constitute a taking. The district court did not find that it was. MHC has never seriously argued that it was. And the reason that's so important, Your Honor, relates to the first error, is that MHC did not buy an unregulated park. You can't analyze the impact of the regulation that MHC suffered, and I'll put that word in quotes, without looking at what MHC bought. MHC ---- Scalia is there any comparison in this record between the 1999 provisions and the 1993 provisions? The provisions themselves are before the Court. Do you mean to say ---- No, but I'm talking about value. Oh, well ---- I mean, the district court compared a time when the ordinance didn't have any effect and then to the 1999 values. But I didn't find anything in there about the 1993 to the 1999. So, Your Honor, it's the two pieces I was just discussing in terms of the $10 million. Okay. The $10 million, not $100 million, was what the district court found at finding number 42, page 82 of the excerpt of the record. Actually, that finding is repeated several times in the findings of fact. So it's that $10 million delta. I would note, though, that even that $10 million number is a hypothetical number based on a scenario where CPI is always just where it has to be to maximize the loss to MHC. And more importantly, this ordinance, like all of these rent control ordinances that have been held as constitutional for decades in this state, has a safety valve. There's an automatic increase. In this case, just like in Guggenheim, it's 75% of CPI. But there's also a safety valve. The park owner can come to the city and go to arbitration and seek a discretionary rent increase that's called a fair return increase. MHC never did that here. So the finding that the adjustment from a sliding scale 100 to 66% CPI to a flat 75% would suffer any long-term loss in rents, that necessarily presumes that MHC never uses the safety valve or that the safety valve is never allowed. And there's just no record for that because they chose not to bring that claim. I understand your argument. I guess I want to back up just a little bit. Is this argument even ripe? Well, no. There's no ripe as-applied challenge because they've never sought to apply that safety valve. Without a fair return request by the park owner, there cannot be an as-applied challenge about what would happen if the safety valve was used. There is a ripe, I suppose, facial challenge to whether changing the automatic increase. Well, was there ever a petition to raise the rent after 99? There was no fair return petition after 99. The park owner has made some capital improvement pass-through petitions, but that's a distinct procedure. There was no petition to the arbitrator and certainly no State court proceedings relating to whether MHC's current 7 to 9% interest rate is a sufficient rate of return on the investment that it made when it bought this rent-controlled park. So should I be sending this back on ripeness rounds rather than reach the Penn Central problem? Well, I think our answer to that, Your Honor, is the same answer that the majority reached in the Guggenheim decision, which I know you were a part of, which is that if the conclusion was to be a fair return on the investment. I had a pretty big dissent on there that I've got to deal with, even on Guggenheim. Yes, but you didn't join that dissent. I know. We presume you don't agree with it. I don't know that I agreed. Frankly, I didn't. But I always worry when they give me a good dissent. I thought it was a good one. The answer to your question, Your Honor, is that if there's no taking in the first place, we've already gone through this is now the 14th year of litigation over this ordinance. I think it's an enormous waste of time to go back for further State court proceedings if the court can reach the conclusion, as it did in Guggenheim, that there's no taking. Certainly the facial claim is not right because they didn't pursue State court remedies, but the facts are all before the court, and the court could, I think, quite clearly hold that MHC cannot bring a facial Penn Central claim when MHC bought a rent-controlled park and, therefore, cannot possibly have had a reasonable expectation of achieving market rent. And that's the finding it argued below, and that's the finding the district court made. There's no suggestion that it had some other expectation. They went for the whole of it. Excuse me. Go ahead. I was just going to say they went for the whole enchilada, as it were, of arguing their expectation was uncontrolled rents. Doesn't this record affirmatively show that the purchase price reflected the fact that it was a rent-controlled park? It certainly does, Your Honor. Indeed, MHC's general counsel testified to that at page 3008 of the record, lines 4 to 18. Is that significant? Has we reviewed the case on appeal? Well, I think it's extremely significant because not only – let me put it in two places. First, it's an objective test. So whether they considered that the existing regulation or not in reaching the purchase price, a reasonable person would have. So they don't meet the objective test anyway. But certainly subjectively, they knew exactly what they were buying. They factored that into the purchase price. And it's not just that the park was rent-controlled. The rent-control regulation had been challenged in state court, and the prior owner lost. And MHC knew that and stepped in in the middle of that case. So, yes, they deliberately bought a rent-controlled park, and they are getting the rents that they were allowed under that rent control with a minor adjustment because of the CPI change, which, A, we believe is insignificant, and, B, which there's a safety valve to correct in the event that becomes significant. And they've never sought to use that. So I think that's dispositive. The Guggenheims – I ask you the question because they're going to get to argue in a minute, and we ought to hear their response. Yes. I imagine we will. Let me ask you another question. Given the precedent, is an injunction even an appropriate relief for a Penn Central taking? No, Your Honor, it's not. And, you know, that goes to the bizarre procedural history of this case. They waived their damage remedy at a time when they weren't making a Penn Central claim. After the claim they were making was extinguished by the Supreme Court, instead of having them lose the case, the district court allowed them to start over, but they're stuck with their damage waiver. Penn Central doesn't allow for an injunction. The only claim they have that would allow for an injunction is the private takings claim. And, you know, that claim is so obviously barred by circuit precedent. This Court has held on seven occasions that this type of law is rationally related to legitimate government purposes. In Guggenheim, in Colony Cove, in the ELS versus San Luis Obispo case, which is an MHC case that they brought and lost, et cetera, et cetera. Back to Lavalde, which is a case that the district court itself found was not distinguishable from this case. And that is one factual finding I do agree with, that there are no facts here that distinguish this case from Lavalde. So, no, I don't believe that an injunction is an appropriate remedy on the Penn Central claim at all. But more importantly, there is no Penn Central taking here. They got what they bought, and they still have it. They're still collecting $3 million a year in rent from this park, and they have the ability to ask for more if they want it. So where's the taking? Unless the panel has more questions, I'd actually like to reserve the rest of my time.  Thank you, counsel. May it please the Court. David Bradford for MHC Financing. Your Honors, this case is a very unique case involving a rent control ordinance that was amended in a dramatic way and is different than any other rent control ordinance that has come before this Court. The district court made findings after hearing from ten different city officials who admitted that they were trying to eminent domain this park. The city committed to the residents that it would assist them in an eminent domain effort. MHC received a letter, Exhibit 157, in 2006 saying if you don't sell to the tenants, we're going to eminent domain this park and condemn it. They then commissioned an appraisal which showed a $20 million value, and their attorney told them, and this is in the minutes of the meeting with the association, they had a 50 percent chance of losing if they tried to condemn the park because it would violate the public use cost. They said it's a rough case. And so what did they do? They got together with the tenants in a private meeting where MHC was excluded. And even though there was a form of rent control in effect, the residents said, you know, if the income from the park was substantially less, the value of the park would be less. The city had told the residents it couldn't afford the purchase price in an eminent domain. So what did they do? They didn't say we can't afford to pay the rent. They said let's reduce the amount of rent that MHC can collect so as to drive down the price so that we can purchase it for less. You heard the finding of a $10 million reduction in value. The park had just been appraised at $20 million. So that's half the value of the park just taken out by the mere enactment of the 99 amendments. That was the effect of the amendments in 99, just as the CPI reduction pertained. But they didn't stop there. They also amended the provision related to recoupment of capital expenditures. And as the district court found, that was very significant because this park had an aging infrastructure. MHC had lagoons and tennis courts and clubhouses and other obligations to maintain where it had to put capital expenditure in. In the 99 amendments, they eliminated the ability to get any return on capital expenditure. And the district court, again, made findings, not based on what the economist had to say, as has been criticized in other cases, but because the mayor got up on the stand and testified. The city council members testified. The city attorney testified. The city manager testified. And they acknowledged, yes, they were trying to transfer the value of the park to the residents. They were committed to do that. And when it came time to amend this law and the residents said drive down MHC's income, their attorney told them, if you're going to tighten the noose on this rent control law and make it much more restrictive than the 93 law, you need legislative findings to do that. You should get a report prepared by our housing expert. So they asked the housing expert, do a report and show us some reasons why we can restrict the rent control in a much more dramatic way. And a preliminary draft of that report was prepared by Mr. Bornholt, the housing director. This was Exhibit 11, and this is discussed in Mr. Guinan's cross-examination. And what it showed was that the residents could afford much more rent. The residents, because people had to pay hundreds of thousands of dollars of premiums even to get in this park, since the original ordinance, their income had gone up dramatically. They had $23,000 more to spend than they did when rent control was put in place, and the rents had barely gone up because there was a rent freeze in effect. This wasn't just rent control. There was a rent freeze at a substantial portion of these sites. So what the preliminary draft report shows is the residents can afford a whole lot more, and the rents have gone up an infinitesimal fraction since the last rent control. And what does the city do? They say stop working on that report. Don't complete that report. And they admit that there was never an analysis done, there was never a report prepared. They just reduced the amount of rent MHC could get by a value of $10 million in terms of its effect on the value of the park, on a $20 million appraised value of the park, in order to make purchase more affordable. This is precisely the case that the en banc decision in Armendariz discussed, and that was in the context of rejecting a due process challenge where the en banc court said you have a private taking remedy available in circumstances where you have regulatory action that has as its goal driving down the value of a property so that it can be transferred at a lower price to another private party. This was exactly the circumstance in Armendariz where, and I believe, Judge Ferris, you may have been on that original panel decision, where, if you recall, the city was using regulatory authority, code violations, denials of permit and so forth, to reduce the value of property so that it could then be sold to a developer at a lesser price. And the court held, as its grounds for rejecting the substantive due process claim at that time, the en banc court held, you've got a private taking remedy. This is the case that the en banc court in Armendariz recognized would constitute a private taking. And here you have detailed findings of fact based upon admissions from the city. You also have admissions from the city's own witnesses, and this is all subject to clearly erroneous review, that they knew that the law, as it was applied, was causing the value of the homes to skyrocket in the park. That was publicly admitted. They admitted it was in the best interest of all the citizens to get rid of the vacancy control provisions. They agreed to do that, and then they reneged on that because they wanted to assist the residents in acquiring this park. So this is a classic private regulatory taking based upon findings of fact that are  None of that was at issue in Guggenheim. Guggenheim didn't concern a private taking claim. Guggenheim didn't have a factual record of any sort. It was a facial challenge to a law that hadn't changed. It was simply readopted. Here you have extensive trial proceedings and findings of fact that the city was trying to eminent domain this park, transferred to somebody else privately, and drove down the price for that reason. There's a Are you challenging the whole ordinance, or are you just challenging the 1999 amendment? We're challenging the course of conduct in applying the whole ordinance. Answer my question. The whole ordinance. The whole ordinance. Well, if you challenge the whole ordinance, I guess I'm wondering – I mean, I wanted you to think very carefully before you answered that question, because it seems to me that's of some significance. If you challenge what happened in 1999, that seems to me to lead me to one result. If you challenge to what happened any other time, then that seems to me could lead in another result. Let me try to give a broader answer to that question. Because I could not understand what the district court was doing, frankly, and I don't understand your answer exactly. We had a rent control ordinance. It was in effect. They made amendments to the rent control ordinance. I can understand challenging those amendments. But the challenge, the rent control itself, seems to me to leave you a little bit in a quandary. Here's the dilemma. The amendments affected the provisions that were already in the law and gave them a different effect. Oh, I understand. But it's just the amendment. Are you challenging the amendments or the fact there was a law at all? We're challenging the effect that the amended law had. But, for example, if I can give an example to illustrate the issue, there was a rent freeze already in effect in the 93 law. The 99 law has the effect of extending that rent freeze. So we would say, well, we're challenging the fact that the rent freeze got extended. Now, to some extent, that rent freeze was already in the old law, so I don't want to say that we're ignoring the impact that that has, but it's extending the rent freeze by reason of reducing the amount that we can raise the rents. The rent freeze is in effect until the frozen rents are equal to the rents at the other sites. So once, for example, you say you can't raise the rents at the other sites by as much, what you're really saying is on all the frozen rent sites, you're going to have an even longer period of time. So you can't disaggregate just the provisions that changed in the 99 law. The provisions that changed in the 99 law made more draconian and burdensome some of the provisions that had already been in the law, but they now had a very different effect than they did before the 99 amendments. So in that sense, it is what happened. Kennedy, so when did the taking occur? The taking occurred. I mean, because under what you've you're the logic you're expressing, you're really saying the taking occurred in 93, and that's. No. No. We're not suggesting a taking occurred in 93. If we're considering a freeze that's existent in the 1993 ordinance, how does that constitute any new action that would constitute a taking? Sure. Because if you go to the expectations of the landowner, it's that we have a freeze, for example, that's going to be in effect for a certain length of time. We have an expectation we can keep up with inflation, that the CPI will be increased by 100 percent of the CPI increase, that we can get back our capital expenditures. Now in 99, for the purpose of transferring this park to the residents, they change all that, and that's contrary to our expectations. We did not expect that the freeze would go on in perpetuity. It had a more defined period of time. This is very similar to Siena County. What was the more defined period of time? The more defined period of time was for however long it took for the rents at the non-frozen sites to equal the rents at the frozen sites. Now, well, it seems to me, I mean, I appreciate what you just said, but it's because it's, I mean, all they did was increase the time that the rent would be frozen. But it didn't seem to me that there was anything in the statutory complex that said it was to take your property. The whole purpose of reducing our NOI, and that's what the regulation did, was it was intended to do two things, and when the regulation was proposed by the residents, they proposed it not because they couldn't afford to pay the rent, but they said because MHC is getting too much NOI. So what they did was reduce our NOI by 75 percent of what it otherwise would have been. That's the finding the district court makes. They do that in 99. Now, it gets worse after 99. The taking continues, if you will, because we apply after 99 for a capital expenditure recoupment petition in the year 2000. And that does relate to the 99 ordinance, and that's part of what helps to ripen this case, and that also gets denied. So now they're enforcing this ordinance, even after 99, in a way that makes its effect even more burdensome. We had a finding by the district court that it considered all 35 other rent control ordinances, the City and we put on evidence of every other rent control ordinance in Northern California, and that this one imposed the single most significant burden of any of the rent control ordinances in terms of its effect on the park owner. Dr. Quigley, who is a distinguished chair of affordable housing at Berkeley, who has promoted affordable housing for 40 years, testified that this was the single most burdensome impact he had ever seen of any affordable housing regulation that he had studied in the course of 40 years. There are findings about the effect that this had. MHC's NOI went from $2 million to $1.5 million once the ordinance began to be applied. And the other thing that the Court found was that 90 percent of the impact of rent control on MHC happened as a consequence of the 1999 law. So 90 percent. Scalia. Did the court, did the district court find that the purpose was illegitimate and its means were not rational in determining, in making its decision? It did make those findings, and it made those findings based upon admissions of the city itself, not just based upon evidence. Where is the part in the district court decision that suggests such a thing? Sure. The district court found, first of all, that the city amended, and this is finding 158, first that it found that they amended and enforced the ordinance for the singular purpose of transferring the value of land from one private party to another. But the district court went on and said they imposed the 99 ordinance, and this is finding 152, they imposed the 99 ordinance under their mere pretext of a public purpose and that the, quote, "...justifications for the ordinance are palpably without reasonable foundation." And that wasn't just his opinion about this. This was the city admitting that the law had been counterproductive. The city itself did its own analysis and said it had caused the price of housing to become unaffordable to the low income and to those who could not, who were elderly, who could not afford to pay hundreds of thousands of dollars more for the home than the home was worth, that this actually made this housing less accessible to people who didn't have hundreds of thousands of dollars in their bank account to prepay the value of rent control and that it disserved its purpose. And the city got that. The city admitted that when they said that it had caused the price of homes to skyrocket and no longer be affordable because of the high purchase price. And that's why the city agreed in 2001 to amend the law, and then, of course, once it got the political pressure from the residents, agreed to renege on that promise to amend the law to eliminate vacancy control. So, again, this is not economic theory. This is the city officials. And perhaps the only case this Court will see where you have city officials admitting that they knew the law was without a reasonable foundation, agreeing that the law should be amended, and then not amending it in the way that they had agreed to do so. These findings of impermissible purpose are, again, based upon what was said at these meetings, what the city officials themselves acknowledged. Justice Kennedy identified several objective indicia of pretext and improper purpose, and every one is present here. One, do you have an identified private group who's going to benefit that are known before the legislation? Well, that was certainly true in 99. Do you have any kind of study that was done to show that the work, the change in the law is appropriate or necessary, as was the case in Kelo? No. The study here was abandoned because it started to show that it wasn't necessary. Do you have evidence, as in Del Monte Dunes, that the city itself wanted to acquire the property through eminent domain? We have all those facts in this case. So whether this Court would reach that same decision if you heard all that evidence, those findings are here before this Court on a clearly erroneous standard of review that compel a finding of a private taking and of a Penn Central violation. The burden was found to be extraordinary. The expectations of MHC were that it could change the use of the park at some point. And if I could just digress for one moment, I do want to answer the questions about injunction and ripeness that were put before. But if you go back to the decision of the U.S. Supreme Court in Yee, where it dealt with California mobile home rent control, with vacancy control, and the Ninth Circuit had said that's a physical taking, the U.S. Supreme Court said, well, it's not quite a physical taking, but it might be if you couldn't change the use of your park to something else. Here, we put on evidence that the city would not allow us to change the use of the park, that we were essentially stuck with whoever came on to the park at the invitation of the other tenants. You have a finding of fact that it was commercially impracticable to change the use of the park. And that was the missing finding in Yee. So all the Penn Central cases say we're looking for a taking that's akin to a physical taking. This is as akin to a physical taking as you can get. That's what the Court in Yee recognized. In terms of injunctive relief, certainly as to a Penn Central taking that – I'm not arguing that as a private taking, but as a private taking, an injunction is appropriate, and the Supreme Court and this Court have recognized on multiple occasions that, as to a Penn Central taking, an injunction may be appropriate as well, as long as the city has not paid for the taking. And if the Court in Madison v. Graham, I believe just a few years ago, said, well,    and declaratory relief. Thomas, you were on that case, indicated, and I quote, Landowners are entitled to seek equitable relief in order to resist takings that threaten to violate the Constitution. Penn Central itself referred to whether a particular restriction will be rendered invalid by the refusal to pay. The Eastern Enterprise v. Apfel case decided by the U.S. Supreme Court found injunctive and declaratory relief appropriate as to the future course of a taking. And we decided to forego our right to past compensation up until the date of trial, which I think is also relevant to ripeness. We said we just want to stop this on a going-forward basis. We don't have to take those damages. We did that so as to simplify some of these issues. But if you look at the decision in First English, the Court distinguishes between the right of compensation, which exists up until the date of trial, that's for the past taking, but if the city stops the taking or you enjoin the taking and it's something that can be enjoined, it's not a physical taking as such, then, of course, it can be enjoined going forward. You have no right to damages. Here, Judge Walker issued a very measured injunction. He didn't invalidate this law. He has allowed rent control to continue in effect for the next decade. He has simply said that when people move out of this park and somebody has no compulsion to move in, that you can fairly bargain with them for what they're willing to pay to move into your park. And that was the only aspect of the law that he, in a very moderate injunction, enjoined. I see I'm out of time. I would like to respond to questions. This is obviously a case with many issues in it. Roberts. I think we have your argument at hand. Any further questions? All right. Thank you. Roberts. I don't have any questions. Roberts. With respect to my colleague who I've been litigating this case with now for 12 years, 99 percent of what he just said is neither in the record nor true. The court did not make any finding that the city intended to seize the park by a mental main, and the city made no such admission at trial. I would point the court to footnote 8, which is on page 22 of our second brief, where we deal with this issue and point to the record citations, where the record is very clear here that in 1991, before MHC bought the park, the city entered into a nonbinding statement that it supported tenant park purchase. Tenant park purchase is a very common way of avoiding this over-the-barrel problem by having the tenants get together and buy the park. And, yes, some studies were done into that. But when it became clear the park owner had no interest in selling, the city made it very clear to the tenants, and this was the testimony at trial at ER 1161 through 1164, that the city had no interest whatsoever in any kind of condemnation proceeding or other proceeding that did not involve a willing seller. The suggestion that the 99 law's actual purpose was to lower the price of the park so the city could then condemn it is wholly without record support, completely false, and, more importantly, this is 2013. It's been 14 years and the city hasn't done that because the city has no interest in doing that. That is just false. The private takings test is a rational basis test. It was error for the district court to look at all at trying to figure out what city council members were thinking when they enacted this law, much less to look at snippets from old letters, letters from tenants about meetings, statements in the newspaper by the city attorney. None of that is appropriate evidence as to whether the law has a rational basis. This circuit has held seven times that this exact kind of law has a rational basis. And the Supreme Court's been very clear, particularly in the Beach communications and the Heller cases cited in our briefs, that the actual motivation of the legislature is irrelevant. What we look at and the reason why is, as the Second Circuit said in Goldstein v. Pataki, it's ultimately impossible to know why politicians do what they do. What the court needs to look at is whether a rational legislature could conceivably believe the law would work. That's clearly met here, particularly with respect to the 99 Amendment, which only changed the CPI adjustment and required capital pass-throughs to be dealt with separately. It didn't even impose the vacancy control that forms the crux of MHC's challenge. When the district court found that the city's purpose was to transfer value from the park owner to the tenant, it was talking about vacancy control. It was talking about its premium finding. That finding, that theoretical premium, existed since 1993. And it's true that when the law is tweaked, there is, in theory, some additional tweak to the premium. That will be true next year if the CPI goes up, for example. That is always true as the premium adjusts, but that's economic theory. We heard a long and empowered speech from Mr. Bradford about why this is a bad law and my clients, or at least the politicians at the time, are bad people. But that's got nothing whatsoever to do with rational basis review. That's got nothing to do with a private takings test, which is exactly the same as under due process and equal protection. And it certainly has nothing to do with Penn Central. We heard a whole laundry list of complaints from Mr. Bradford about aspects of the law that had existed when MHC bought the park. The rent freeze. No evidence in the record about the economic effect of the rent freeze or any finding by the district court that the rent freeze itself caused an economic impact in any way that constitutes a Penn Central taking. We heard about the capital pass-through that they sought in 2000, which was not denied, but that's not in the record because that was never fleshed out. They've, in fact, sought several capital pass-throughs. They've all been partly granted, and there's continuing proceedings with respect to that. That's not part of this case. The only capital pass-through that was actually in the record was the one that MHC brought and then settled in 1996. That's the one the district court got confused about and claimed exhausted a challenge to the 99 law, even though it was three years earlier. That's the only capital pass-through the court made a finding on. This suggestion that MHC had an expectation of always getting 100% CPI when it bought the park is nonsense. When they bought the park, the ordinance provided that if CPI was 5% or more, they only got 75%. Now, we've been very lucky in this country to have a period of low inflation for the last 20 years, but that has certainly not always been the case. It is not certain that that will always be the case again. So the idea that somehow going from a sliding scale to a flat scale drastically affected their expectations, that just doesn't hold water. And in concrete pipe, the Supreme Court told us that when you act in a regulated field, your reasonable expectation has to include not only the existing law, but also the possibility that the legislature may buttress that law with further amendments. Here, the notion of a 75% increase is completely consistent with the field of mobile home park regulation. It was 75% in Guggenheim. It was 75% in Ventura Mobile Homes. In the ELS case, the San Luis Obispo ordinance that MHC litigated and lost, the automatic approval is 60%. They still bought that park. So the idea that they have some constitutional right to never use the safety valve and to have an automatic 100% CPI adjustment, there's simply no support for that. The city here, let me say one last thing about this so-called powerful group of people. There are 58,000 people approximately who live in San Rafael. There are 400 families who live at this park. The city council didn't listen to these families because somehow these low-income, middle-income, elderly people are the most powerful people in San Rafael. It listened to them because they're the most vulnerable people. It listened to them because MHC, as the record shows, was telling them without rent control it would triple their rents. And they were coming to the city and they asked for rent control to be increased because the CPI did not, their own income did not necessarily track CPI. The city had made a rational decision to adjust the law in 1999. It had a right to do that. And this Court has been crystal clear that that is exactly the type of law that has a rational basis. Whether it's good policy or not is not the point. It's not the function of the Court. It certainly was not the function of the district court to figure out whether the tenants' investments were real, to decide that the tenants had no equity in their homes, even though in Laval this Court held that the tenants, that the right to protect that equity was a legitimate government purpose. The Court had no power to conclude that the city's concern that elderly people who move out of a traditional home, buy a mobile home with cash, might still want to be able to resell that asset later when they get sick and need care. And therefore, it's better for them to buy something that appreciates in value than to just dump rent down a hole. These are all legitimate public purposes that the city had every right to take. And the fact that the district court decided to hear the evidence in a certain way and to paint the city, an MHC's rather attempt to paint the city as bad people, has no bearing on a rational basis review and has no bearing on a Penn Central analysis. Your Honors, there is nothing atypical about this law. Despite Mr. Bradford's comment, the district court here, which was clearly no fan of this law, made an express finding that the records facts did not distinguish this case from Laval. That should have also governed the private takings case. We don't look in the hearts and minds of legislatures and get into these debates about what they were really thinking when they passed laws. So the thing that's extraordinary about this case is not the law at issue. It's very common. A hundred jurisdictions in California have it. But the fact that the district court for the first time found this kind of law to be a Penn Central taking, even though MHC bought the part, subject essentially to the same regulation. Your Honors, the city would ask that the court reverse the judgment in favor of MHC on both constitutional claims and direct the judgment to be entered for the city. Any further questions? Just one. So as the, I mean, the reason that I could question counsel about what the district court had found and whether it met the appropriate standard, the district court conducted a hearing, the district court made some findings of fact. Can I, am I free to ignore those findings? There are two kinds of findings that the district court made, well, really three. There's findings as to things that are not disputed, the history, the ordinance, stuff like that. We're not talking about that. I know. There are findings about matters that weren't properly within the purview of the district court, like the subjective intent of the legislature, what it was really doing. You are entitled, and how, excuse me, and more importantly, how the law worked, whether the law served its purposes. You are absolutely entitled to disregard those findings because they weren't supposed to have occurred in the first place. The Supreme Court told us in Lingle that, and in Kelo, that these type of trials where experts debate about how a law works have no proper place in our takings jurisprudence. So if the inquiry has no proper place in our jurisprudence, it doesn't need to be given any deference by this court. Then the last category is there are some things like how much money did MHC lose? You know, what was the value of the park? Those are findings which, in all fairness, probably are subject to clear error, but, you know, our arguments are not based on the notion that those findings are wrong. Our arguments are based on those, that was a finding as to the wrong thing, and when you look at the findings as to the actual impact of the 99 law, you find no Penn Central taking. But absolutely, Your Honor, with respect to the private takings, it's not a question of findings. This should have been decided on a 12b6 motion, the same way most of these cases are, because the rationality of the law is not subject to courtroom fact finding. Thank you, counsel. Thank you both for your arguments, well argued and well presented by both sides.
judges: Farris, Thomas, Smith